UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

JAMES GOMEZ, by his mother and natural guardian Gisela De La Cruz,

Plaintiff,

-against-

THE CITY OF NEW YORK, DENNIS EASTWICK, DENNIS MUNGE, and GEORGE SANTANA, individually and in their official capacity as employees of the New York City Police Department,

Defendants.
-----------------------------------------------------------x

PLAINTIFF JAMES GOMEZ'S STATEMENT PURSUANT TO LOCAL RULE 56.1 IN RESPONSE AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

05 CV 2147 (GBD)

Genuine issues of material fact prevent entry of summary judgment in this matter. This Rule 56.1 Statement is structured in two parts: Plaintiff's Statement of Relevant Facts and Response to Defendants' Rule 56.1 Statement. Pursuant to Fed.R.Civ.P. 56(e), exhibits relied upon by plaintiff are annexed hereto.

The Plaintiff sets out the following as his Rule 56.1 Statement.

## I. Plaintiff's Statement of Relevant Facts

1. On the afternoon of July 5, 2004, some time after five o'clock, plaintiff James Gomez accompanied his sister to buy himself new sneakers for his family's planned trip to visit relatives in the Dominican Republic. [Exhibit 1, pp. 33-39].

2. On July 5, 2004 James Gomez was fifteen years of age [Exhibit 1, p. 7; Exhibit 2, p. 4], he was approximately five foot eight inches tall and weighed about one hundred and sixty-five pounds. [Exhibit 1, pp. 7, 34-35].

3. Along the way the shopping trip for new sneakers was interrupted when his sister, Gisela Gomez, stopped at a salon on Clinton Street to have her eyebrows waxed. [Exhibit 1, p. 32]. The teenager decided to wait outside of the Salon. [Exhibit 2, p. 8]. He walked a few yards to a payphone near to the southwest corner of Clinton Street and Stanton Street. [Exhibit 1, p. 36].

4. Plaintiff used the phone to call Raphael Balbi, a friend and fellow student at Xavier High School, to talk about their plans to hang out while James shopped for the sneakers. [Exhibit 1, pp. 36-37].

5. He leaned against the rounded top of a short traffic pole that was located beside the payphone. The traffic pole was a few feet across the sidewalk from the Lotus Café/[1] on the southwest corner of the intersection of Stanton and Clinton. [Exhibit 1, pp. 11, 29, 38].

6. James decided to check his money to make sure he had enough for the new sneakers. [Exhibit 1, pp. 41-42]. He took the bills from his front trouser pocket and counted. The six twenty dollar bills and the one ten dollar bill came to a total of one hundred and thirty dollars. [Exhibit 1, pp. 39-40]. He did not have a wallet and, when he took the loose bills from his pocket, there was a Winterfresh gum wrapper amongst the bills. [Exhibit 1, p. 42].

7. It took Mr. Gomez about five seconds to count the seven bills. [Exhibit 1, p. 43].

8. The gum wrapper was very small. It had a plain paper surface on one side and a thin sheet of tin foil on the other side. [See Exhibit 8].

9. At his deposition plaintiff was asked and he answered the following questions:

> Q: Did you do anything other than count your money?
>
> A: No.
>
> [...]
>
> Q: Did you take anything else out of your pocket other than the money?
>
> A: There was a gum wrapper with my money.

---

1. On April 10, 2002, almost two years before the incident the New York Times published an account of the neighborhood around the Lotus Café and the area around the intersection of Clinton and Stanton Streets. <u>See</u> Exhibit 13. The article, entitled "And to Think That I Ate It on Clinton Street," describes Clinton Street's "evolution from drug bazaar to a lively Restaurant Row," and states that "In 1997, the Lotus Café, by day a coffeehouse for the goatee and laptop set, by night a bar, was the one new touch." By 2002, the New York Times reports that "Clinton Street has undergone the equivalent of a "whole body transformation" from the time when it was a "grim graffiti-ridden streetscape [where] by night bags of heroine were sold by brand name."

Q: What do you mean?

A: It was stuck in between.

Q: What did you do?

A: With the gum wrapper?

Q: Yes.

A: I didn't do anything with it.

[Exhibit 1, p. 42].

10. During the time he waited on the southwest corner of Clinton and Stanton Streets for his sister, Mr. Gomez did not pace back and forth, [Exhibit 4, pp. 55-56], did not speak to anyone passing by, nor did he get up and leave the corner and then return. He did not hand anyone anything and no one handed him anything. [Exhibit 2, p. 23; Exhibit 4, pp. 55-56, 143-146]. When watching the plaintiff, defendant Munge admits no one came up and spoke to James: no one approached James, no one handed James currency, and James did not appear to hand anything to anyone else. [Exhibit 4, pp. 143-145].

11. The only thing James Gomez did on the southwest corner of Clinton and Stanton was to wait and to count his money — in broad daylight on the sidewalk right before the enormous pictures windows of a busy Internet Café. [Exhibit 1, p. 42; Exhibit 2, pp. 22-23; Exhibit 16: Photographs 1-4].

12. Right after counting his money, Mr. Gomez noticed two men approaching him "very rapidly."/[2] When he first saw the men they were about four feet away from him. [Exhibit 1, pp. 45-46].

13. Gomez still had the money in his right hand. [Exhibit 1, p. 47]. The first thing he heard was one of the plainclothes men say "Get him." [Exhibit 1, p. 48; Exhibit 2, p. 10].

14. Mr. Gomez was immediately grabbed by defendant Santana by the wrist. [Exhibit 2, pp. 10-11; see also Exhibit 17, Civilian Complaint Report]. The plaintiff pulled to get free and as soon as he did so defendant Munge grabbed plaintiff's other arm. [Exhibit 1, pp. 47-51; Exhibit 2, p. 11].

15. Because the plainclothes men ran at him yelling just at the moment when he had taken money out to count and because he knew he wasn't doing anything wrong, Mr. Gomez did not fully understand what was going on. He did not assume the men were police

2. In his CCRB Interview, defendant Estwick admits that defendants Santana and Munge were "running towards" the plaintiff.

officers. When the men then immediately grabbed him, plaintiff thought he was being mugged – "I thought they were going to rob me." [Exhibit 2, p. 30].

16. He told the men "let go ... it's my money." [Exhibit 2, p. 14].

17. Defendant Santana admits when the officers approached the plaintiff, Mr. Gomez did not realize the men were police officers. [Exhibit 5, 172-183].

18. Similarly, defendant Munge admits that James was saying "you're not cops, you're not cops" repeatedly as the plaintiff was grabbed and cuffed. [Exhibit 4, p. 78].

19. Plaintiff tried to pull his arms free from defendants Santana and Munge but was then slammed to the ground face first. [Exhibit 1, pp. 50-51; Exhibit 2, p. 12].

20. Plaintiff tried to move but was unable to do so as defendants Munge and Santana were on top of him. Plaintiff was immediately handcuffed behind his back. [Exhibit 1, pp. 52-53].

21. Defendant Santana admits that from the moment plaintiff hit the ground to the time James was handcuffed was a couple of seconds. [Exhibit 5, p. 138].

22. On the ground Mr. Gomez continued to say "it's my money," and "you guys aren't cops." [Exhibit 5, pp. 172-183; Exhibit 10, p. 3, Santana Interview Details]. One of the defendants took the cash from plaintiff's hand. [Exhibit 1, p. 51; Exhibit 2, p. 14].

23. Defendants Estwick, Santana, and Munge handcuffed the plaintiff behind his back [Exhibit 4, p. 61] as James was face down in a small puddle of water in the street. [Exhibit 4, pp. 175-178].

24. The defendants picked up Mr. Gomez and placed him against their unmarked police van and then searched all of his pants' pockets, retrieving house keys and a contact lens holder. [Exhibit 1, pp. 53, 77; Exhibit 2, pp. 13-14].

25. Before plaintiff was placed in the unmarked van, defendant Estwick ("the tall one"[Exhibit 1, p. 79]) looked through the bills and observed the Winterfresh gum wrapper. [Exhibit 1, p. 80].

26. Plaintiff was put in the van and was continuously questioned by the defendants during the five minute trip to the police station known as PSA 4. Defendants asked where the drugs were, and plaintiff told them the truth – that he did not have drugs on him. Defendants asked his age, and plaintiff told them the truth – that he was fifteen years old. Defendants did not believe what James was saying and "[t]hey asked me if I possessed any drugs on me, and if I did, to tell them at that point because if I didn't, I would

get into trouble." Plaintiff continued to insist truthfully that he did not have drugs on him. [Exhibit 2, p. 18].

27. When the unmarked van arrived at the PSA 4 indoor garage, defendant Estwick opened the zipper of James' trousers and looked inside his pants for drugs. Defendant Santana swiped his hand on the outside of plaintiff's pants along the crease in the plaintiff's buttocks, feeling for concealed drugs. [Exhibit 1, pp. 85-86].

28. Inside PSA 4, plaintiff was taken to the "juvenile room," and handcuffed by one arm to a restraining bar. [Exhibit 1, p. 86]. One of the individual defendants called plaintiff's mother, Gisela de la Cruz. [Exhibit 1, p. 89; Exhibit 3, pp. 57-58].

29. Upon her arrival at the stationhouse, plaintiff's mother was in a heightened state of anxiety – her son had never been in trouble and had never been arrested. [Exhibit 14: Affidavit of Gisela de la Cruz, sworn to on May 23, 2007, at ¶10; See also Exhibit 2, pp. 34]. In the juvenile room she knelt down beside him and noticed that his white T-shirt was dirty and that his clothes were wet. She noticed that his face was very red and that he had scratches and small cuts on his body. [Exhibit 14, ¶¶ 3-4].

30. Plaintiff's mother asked the defendants how her son had been injured and how he had gotten wet and dirty. Defendants explained that "we fell" in apprehending James, "he was resisting." [Id., ¶ 7].

31. When plaintiff's mother asked why her son was arrested, one of the defendants said "look at what your son had on him" and pointed to the money and Winterfresh gum wrapper on one of the tables in the juvenile room. [Id., ¶ 6].

32. Defendants then argued with Ms. De la Cruz about the age of her son, insisting that he was really seventeen years old. She showed them James' passport, but they remained incredulous. The defendants attempted to calculate James' age using the date on his passport, but continued to insist James was seventeen years old. Finally defendant Santana used the calculator on his cellphone to calculate that James was fifteen. [Id., ¶ 5]. Defendant Santana acknowledged in his pre-trial testimony that at the time of the incident he had a calculator on his cellphone. [Exhibit 5, p. 221].

33. Plaintiff was released to his mother and returned to his home. [Exhibit 14].

34. Shortly thereafter, plaintiff accompanied by his older sister went to Bellevue Hospital in Manhattan where he was treated for the cuts, bruises, and scrapes he had suffered during the incident. Bellevue Hospital treatment records indicate, *inter alia*,

abrasions to the right side of James' face, to his right hand (knuckles) and arm (elbow and forearm), and to his left wrist. [Exhibit 6, pp. 2-4].

35. A Bellevue Hospital pictorial chart of some of the plaintiff's injuries indicates a nine by three and one half centimeter (9 x 3.5 cm.) abrasion to the left side of his face, a four by one-half centimeter (4 x .5 cm.) bruise to his left shoulder area, as well as a four by five centimeter (4 by 5 cm.) bruise on his left wrist. [Exhibit 6, p. 6].

36. After receiving medical care, Mr. Gomez, accompanied by his sister, went to the 7th Police Precinct in Manhattan to file a complaint. [Exhibit 2, p. 26]. A little after midnight on July 6, 2004 James gave a tape-recorded statement to the Internal Affairs Bureau and investigators took five polaroid photographs of James' injuries. [See Exhibit 9]. The investigators questioned James about the cuts, bruises and scrapes.

37. The plaintiff lost sleep for a period of approximately two weeks after the incident [Exhibit 1, p. 124; Exhibit 2, pp. 29-30].

38. The morning after the incident, plaintiff began experiencing head and neck pain — "physically-wise, my head and neck were hurting for about a week." [Exhibit 1, pp. 119-120; Exhibit 2, p. 30].

39. Upon his return from a month in the Dominican Republic, plaintiff 's mother convinced him to seek mental health counseling for the emotional repercussions of the incident. [Exhibit 1, p. 126-127]. Notes from his first session with Rosa De Lara, C.S.W., indicate feelings of depression "due to him being arrested by undercover cops without reason. He became overwhelmed with sadness/tears as he retold the incident." Ms. De Lara also notes that she tried to "normalize his feelings as an appropriate response to being traumatized." [Exhibit 7].

40. A week later Ms. De Lara reports that though James is feeling somewhat better, there was a discussion of the losses he experienced as a result of the incident such as a twist of his sense of safety and his sense of freedom. [Exhibit 7].

41. In a session in January 2005, more than six months after the incident, Ms. De Lara's treatment notes indicate James relating feelings of being scared on the street, fears of being hurt again, and dreams of being "robbed/chased." [Exhibit 7].

## II. Response to Defendants' Rule 56.1 Statement

Defendants' Statement ¶1

1. On July 5, 2004, at approximately 6:00 p.m., defendants Officer Estwick, Officer Munge, and Officer Santana were patrolling the area around Clinton Street and Stanton Street in Manhattan as part of their assignment with the gang unit in the PSA 4 Precinct of the New York City Police Department. (See Deposition transcript of Dennis Estwick dated March 29, 2006, pp. 12, 17, 41 attached as Exhibit "A" to the Declaration of Hillary Frommer, hereinafter the "Frommer Declaration;" deposition transcript of George Santana dated March 30, 2006, pp. 11, 28 attached as Exhibit "B" to the Frommer Declaration; deposition transcript of Dennis Munge dated March 31, 2006, pp. 13, 26 attached as Exhibit "C" to the Frommer Declaration).

Plaintiff's Response to Defendants' Statement ¶1

Defendants Estwick, Munge, and Santana were assigned on July 5, 2004 to a Gang Unit anti-crime team in the PSA 4 Precinct patrolling "several of the hot spots where our conditions are." [Exhibit 3, p. 34]. Such hot spots involve as much as "17 [housing] developments over five precincts." [Exhibit 3, pp. 34-35]. Defendant Estwick was regularly assigned to the Gang Unit. [Exhibit 3, pp. 19-20]. Defendant Santana has previously been assigned to the Gang Unit "maybe once or twice" before the day of the incident [Exhibit 5, p. 13]; and it was his first time working with defendant Estwick on a gang unit patrol. [Exhibit 3, p. 24]. The day of the incident was the first time defendant Munge has been assigned to a Gang Unit patrol. [Exhibit 4, p. 80].

Defendants' Statement ¶2

2. Officers Estwick, Santana, and Munge were dressed in plain or civilian clothes and each wore his police shield around his neck. (See Exhibit A, pp. 28-29, Exhibit C, pp. 62-63).

Plaintiff's Response to Defendants' Statement ¶2

There is no dispute the three individual defendants were dressed in civilian clothing and were patrolling in an unmarked police van.

Defendants' citation above is to defendant Munge's testimony (Defendants' Exhibit C, pp. 62-63), and indicates Munge's recollection that he and defendant Santana, while having

their shields around their necks, *did not* hold those shields in their hands in display as they approached the plaintiff:

> Q: Did you said [sic] something else?
>
> A: I displayed my shield. My shield was already out as I was exiting the van.
>
> Q: Was your shield in your hand?
>
> A: No, sir, around my neck on a chain.
>
> Q: You weren't holding it out?
>
> A: No, sir./[3]

Defendants' Statement ¶3

3. The officers were observing that specific area as part of their patrol duties that day because they knew that the area around Clinton and Stanton Streets was a drug-prone location. (See Exhibit A, pp. 41, 49; Exhibit B, p. 30).

Plaintiff's Response to Defendants' Statement ¶3

There is an inference that the defendants were on a stake-out at the location and that Mr. Gomez simply wandered into view. But there is testimony that, on the contrary, the defendants only began their observation of the plaintiff after one or more of them had spotted the Winterfresh gum wrapper as the van drove to the intersection of Clinton and Stanton Streets. [See Exhibit 3, pp. 46-47; pp. 89-91 (Q: Did you stop the vehicle [unmarked van] to observe Mr. Gomez? A: Probably); see also Exhibit 5, pp. 33-34, defendant Santana indicates unmarked van stopped at corner of Clinton and Stanton "because of observation" by Munge and Estwick of "what appeared to be like a roll-up marijuana on the corner .... They thought it was rolling marijuana into either aluminum foil or a wrapper into a cigarette."].

Defendants' individual or collective knowledge about the intersection as a "drug-prone location," is in contrast to the defendants singular unfamiliarity with any other aspect of the site. Despite allegedly locking up over "20 people on that corner alone for criminal sale of narcotics," defendants Estwick had no knowledge of that corner's most prominent

---

3. But Cf. Santana's recollection to the contrary – that both officers *did* display their shields in their hands when they approached. [Exhibit 5, pp. 168-170].

feature the Lotus Café and Lounge. [Exhibit 3, pp. 49-50; see also Exhibit16, Photographs 1-6]. Despite his claim to have returned to the corner of Clinton and Stanton "frequently" as part of his on-going duties at PSA 4 [Exhibit 5, pp. 113-114], defendant Santana testified erroneously to the existence of a grocery store at the location while having no recollection of a bar or coffee bar. [Exhibit 5, p. 30]. Despite his claim to have returned to the location a "dozen" times since the July 5, 2004 incident [Exhibit 4, pp.9-10], defendant Munge did not know anything about a bar or coffee bar or the Lotus Cafe's enormous picture windows. [Exhibit 4, pp. 45-48].

Finally, defendant Munge prepared a "Stop, Question and Frisk Report Worksheet" [Exhibit 12]. On the second page of that document under a heading "Additional Circumstances/Factors" are ten boxes, one of which is "Area Has High Incidence of Reported Offense of the Type Under Investigation" which defendant Munge did *not* check. In short, given an opportunity to indicate the area was a drug prone location, defendant Munge did not so indicate. See Exhibit 12.

Defendants' Statement ¶4

4. Officer Estwick knew the area was drug prone because prior to July 5, 2005, he had effectuated numerous narcotics related arrests at the corner of Clinton and Stanton Streets. (See Exhibit A, p. 49).

Plaintiff's Response to Defendants' Statement ¶4

Defendant Estwick was unfamiliar with the corner of Clinton and Stanton. See Plaintiff's Response to Defendants' Statement ¶3.

Defendants' Statement ¶5

5. While conducting their observations from the police vehicle, Officer Estwick and Officer Munge observed plaintiff standing at the corner of Clinton and Stanton Streets. (See Exhibit A, p. 43; Exhibit B, pp. 39-40).

Plaintiff's Response to Defendants' Statement ¶5

There are four corners at the intersection of the two crossing one-way streets [See e.g., Exhibit 1, p. 12]; plaintiff was on the southwest corner. [Exhibit 1, p. 11; see also

Exhibit 17, pp. 22-23]. Photographs 5 and 6 of Exhibit 16 shows where plaintiff was standing when he counted his money.

Defendants' Statement ¶6

6. Plaintiff admits that at approximately 6:00 p.m., he was standing on the corner of Clinton and Stanton Street by himself. (See Deposition transcript of James Gomez dated April 3, 2006 p. 36 attached as Exhibit "D" to the Frommer Declaration).

Plaintiff's Response to Defendants' Statement ¶6

Plaintiff was by himself on the *southwest* corner of the intersection of Clinton and Stanton Streets a short time before 6:00 p.m. on July 5, 2004. [Exhibit 1, p. 36].

Defendants' Statement ¶7

7. Plaintiff admits that while he was on the corner of Clinton and Stanton Streets he removed $130 in cash from his pants pocket and began to count it. (See Exhibit D, pp. 41-42).

Plaintiff's Response to Defendants' Statement ¶7

Mr. Gomez took seven bills from his front trouser pocket; the bills consisted of six twenties and one ten dollar bill, which plaintiff counted in about five seconds. [Exhibit 1, pp. 39-43].

Defendants' Statement ¶8

8. Plaintiff also admits that he took a gum wrapper out of his pocket. (See Exhibit D, p. 42).

Plaintiff's Response to Defendants' Statement ¶8

The Winterfresh gum wrapper was in and among the bills; plaintiff did not remove the wrapper from his pants separately. [Exhibit 1, pp. 42-43].

Defendants' Statement ¶9

9. When he first observed plaintiff, Officer Estwick saw plaintiff holding a large amount of money in one hand and holding a small piece of tin paper in the other hand. (See Exhibit A, p. 44).

Plaintiff's Response to Defendants' Statement ¶9

Plaintiff was holding seven bills in his hands counting them in about five seconds. See Plaintiff's Response to Defendants' Statement ¶8.

Defendant Estwick claims to have seen not a "small piece of tin paper" but an "aluminum *envelope*" [See Exhibit 18, Estwick Memobook; see also Exhibit 3, pp. 118-121]. In contrast to plaintiff's account, defendant Estwick maintains that James had "a whole lot of money ... probably over 20 bills in his hand." Estwick admits he was 20 to 30 feet away from plaintiff at the point when he alleges he made the observations. [Exhibit 3, p. 116].

Plaintiff did not have over 20 bills in his hand, and neither was he observed holding a "small piece of tin paper." First, the gum wrapper was amongst the seven bills James was counting. [Exhibit 1, pp. 38-43]. Secondly, the gum wrapper in question is not an "envelope," it is not made entirely of foil, but rather has a thin film of foil on one side and a dull non-silvery plain surface on the other side. [See Exhibit 8]. Third, Estwick admits he was 20 to 30 feet away. [Exhibit 3, p. 116]. Defendant Estwick did not see plaintiff holding 20 bills and he did not observe the plaintiff holding the Winterfresh gum wrapper.

Defendants' Statement ¶10

10. The items in plaintiff's hand drew Officer Estwick's attention to plaintiff. (See Exhibit A, p. 47).

Plaintiff's Response to Defendants' Statement ¶10

Defendants Estwick was approximately 20 to 30 feet away, when he alleges he saw James counting money. [Exhibit 3, p. 116]. The defendants were unable to actually see Mr. Gomez' Winterfresh gum wrapper. [See Plaintiff's Response to Defendants' Statement ¶9].

Defendants' Statement ¶11

11. Based on his experience as a police officer, Officer Estwick knew that people used small pieces of tin foil that resemble gum wrappers to roll and store drugs. (See Exhibit A, pp. 108-109, 144-145).

Plaintiff's Response to Defendants' Statement ¶11

Defendant Estwick did not observe James Gomez roll anything in the aluminum envelope he claims he saw, nor did he see James store anything in the aluminum envelope he claims he saw. [Exhibit 18, Estwick Memobook; Exhibit 3].

Defendant Estwick testified that his training as a police officer in street narcotics enforcement made him aware of "different types of drug packaging" consistent with "that type of wrapping" — "I made lots of arrests for cocaine inside aluminum foil."

> Q: When you say aluminum foil you mean like Reynolds Wrap?
>
> A: Yes.

[Exhibit 3, pp. 108-109].

Defendant Estwick claims that such aluminum foil is "consistent with a gum wrapper – it has similar characteristics." [Exhibit 3, pp. 108-109]. Defendant Estwick claims to have witnessed — as many as twenty or thirty times — individuals roll or store drugs in a gum wrapper similar to the Winterfresh gum wrapper he was shown at his deposition. [Exhibit 3, 144-145; Exhibit 8]. But he never saw James do these things.

In fact, whereas defendant Estwick claimed he would not have been surprised if James had drugs on him when James was brought into the precinct [Exhibit 3, pp. 107-108], after examining the wrapper and finding it empty and free of residue he did not test the wrapper for drugs. [Exhibit 3, pp. 109-110].

Defendants' Statement ¶12

12. Officer Estwick communicated his observations of plaintiff to Officers Munge and Santana. (See Exhibit A, p. 49; Exhibit B, pp. 32-33).

Plaintiff's Response to Defendants' Statement ¶12

The van came to a stop on the north western side of the intersection behind a stop line. [See Exhibit 16, Photographs 7-10]. Estwick was the driver [Exhibit 4, p. 50], Munge was sitting in the right front passenger seat [Exhibit 5, p. 27] while Santana was just behind

Munge on the right side of the vehicle [Exhibit 4, p. 50]. James Gomez was to the officers' right [Exhibit 4, p. 40] on the southwest corner of the intersection. [Exhibit 1, p. 36]

The officers were observing plaintiff, in other words, from the same vantage point in the same vehicle.

Defendant Estwick "probably" directed the attention of officer Munge and Santana to the aluminum "envelope" Estwick observed: "I probably did, I probably made a reference to it." [Exhibit 3, 126-127].

Defendants' Statement ¶13

13. Thereafter, the officers continued to watch plaintiff for approximately five to ten minutes (see Exhibit B, p. 46; Exhibit C, p. 51).

Plaintiff's Response to Defendants' Statement ¶13

Plaintiff was set upon by defendants almost immediately upon taking out his money to count. [Exhibit 1, p. 45].

Defendants' Statement ¶14

14. Officer Munge also saw plaintiff holding a wad of money in one hand and small piece of tin foil like paper in the other hand. (See Exhibit C, p. 43).

Plaintiff's Response to Defendants' Statement ¶14

Plaintiff was holding seven bills in his hand, not a "wad." He did not possess a "piece of tin foil like paper" but had within the bills he was a counting a Winterfresh gum wrapper. [Exhibit 1, pp. 39-43; Exhibit 8].

At his deposition defendant Munge did not know the number of bills that were recovered from plaintiff. [Exhibit 4, pp. 131-132]. His Memobook does not refer to a "small piece of tin foil like paper," but to "aluminum packaging." [See Exhibit 18, Munge Memobook].

Defendants' Statement ¶15

15. Officer Munge also saw that plaintiff appeared to be rolling the tin paper in his hand. (See Exhibit C, p. 43)

Plaintiff's Response to Defendants' Statement ¶15

Defendant Munge gave the following testimony at his deposition:

Q: What did you see in his [Gomez'] hands?

A: Well, one hand I saw a wad of money and in the other hand seemed to be he was rolling some type of paper, some type of tin foil, something to that effect.

Q: When you say he was rolling, can you describe it for me, what that motion was with his hand?

A: (indicating), with the money in one hand, he was doing a rolling motion.

Q: Is that similar to how someone would roll either a cigarette with —

A: That's correct.

Q: Or a joint?

A: That's correct.

Q: But he was using both hands to roll?

A: That's correct.

Q: But it's the motion like rolling a cigarette?

A: That's correct.

Q: Was this wad of money he had in his hand affecting the rolling motion?

MS. FROMMER: Objection. You can answer.

A: Not to my knowledge.

[Exhibit 4, pp. 43-44].

Defendant Santana makes it clear in his CCRB interview that defendant Munge reported in the van to his fellow officers that James Gomez was rolling a marijuana cigarette. [Exhibit 10, p. 3, Santana Interview Details]. Defendant Estwick did not see the plaintiff rolling anything — "I don't remember any blunt." [Exhibit 3, p. 101].

Thus, according to Munge, plaintiff was making a joint-rolling movement with a gum wrapper; whereas Santana indicates Munge reported this action as plaintiff rolling a

marijuana cigarette; whereas defendant Estwick saw no joint-rolling action and no appearance of plaintiff rolling a joint or blunt.

Defendants did not see plaintiff using his gum wrapper to make a joint-like rolling motion as plaintiff was not rolling a joint with his Winterfresh gum wrapper:

Q: What did you do?

A: With the gum wrapper?

Q: Yes

A: I didn't do anything with it.

[Exhibit 1, p. 42].

Defendants' Statement ¶16

16. Based on his knowledge and experience as a police officer, Officer Munge believed that plaintiff was acting in a suspicious manner and may have been engaged in narcotics related activities. (See Exhibit C, pp. 109-111).

Plaintiff's Response to Defendants' Statement ¶16

The Plaintiff counted seven bills and was not rolling a Winterfresh gum wrapper. See Plaintiff's Response to Defendants' Statement ¶15.

Defendant Munge's observation of the joint-like rolling motion he alleged James was making with the Winterfresh gum wrapper lead him to the conclusion that James was rolling a joint:

Q: Can you tell me the actions that you observed by Mr. Gomez that were indicative of engaging in a drug transaction?

A: Well, once again, rolling that piece of paper/tin foil looked to me like he was actually rolling a marijuana cigarette. [...]

[Exhibit 4, p. 143].

Defendant Munge admits: no one came up and spoke to James, no one approached James, no one handed or appeared to hand him U.S. Currency, nor did James appear to hand anything to anyone else. [Exhibit 4, pp. 143-146]. Further, defendant Munge admits that in the time he observed plaintiff, James did not move around, didn't go around the corner, didn't move to any other corner of the intersection, did not walk away and come back, and he did not pace. [Exhibit 4, pp. 55-56].

Defendants' Statement ¶17

17. Officer Santana observed plaintiff fidgeting with his hands pacing back and forth on the street. (See Exhibit B, p. 46).

Plaintiff's Response to Defendants' Statement ¶17

Plaintiff was not fidgeting with his hands, he was counting his money for his new sneakers. [Exhibit 1, p. 42]. In the few minutes plaintiff was at the southwest corner of the intersection, all he did was use the payphone to call a school friend, and count his money to make sure he had enough for his new sneakers. [Exhibit 2, pp.22-23].

Defendant Munge admits plaintiff was not pacing. [Exhibit 4, p. 56].

Defendants' Statement ¶18

18. Based on his experience as a police officer, Officer Santana knew individuals wrapped and sold marijuana in small pieces of tin paper. (See Exhibit C, p. 153).

Plaintiff's Response to Defendants' Statement ¶18

Defendant Santana admits he never saw plaintiff wrap anything or store anything or sell anything. He admits he *did not see* the joint-rolling action with the gum wrapper Munge was allegedly telling him about.

> Q: Did you look at Mr. Gomez at that point?
>
> A: Sure.
>
> Q: Did you see this thing that he was rolling?
>
> A: No.
>
> Q: Did you inform Officer Munge and Officer Estwick that you couldn't see it?
>
> A: Correct. And that I didn't see it.
>
> [...]
>
> Q: But you didn't see it?
>
> A: I didn't see it.
>
> Q: But they told you they thought he was smoking a joint or something?
>
> A: Right.

Q: Not smoking, I'm sorry, but that he was rolling marijuana in something?

A: Right, in some fashion.

Q: Did you look more closely to see if you could see it?

A: Yes.

Q: And you still didn't see it?

A: I still didn't see it.

[Exhibit 5, pp. 38-39]

Defendant Santana also admitted that in his experience people do not smoke marijuana in pieces of tin foil. [Exhibit 5, pp. 152-154].

Defendants' Statement ¶19

19. Because of plaintiff's specific gestures, Officer Estwick and Officer Santana believed that plaintiff was in possession of marijuana. (See Exhibit A, p. 148; Exhibit B, pp. 38).

Plaintiff's Response to Defendants' Statement ¶19

Defendant Estwick did not see any specific gestures by plaintiff indicative of marijuana possession nor did form a reasonable belief that plaintiff was in possession of marijuana — "I don't remember any blunt." [Exhibit 3, p. 101]. Defendant Santana did not see the Winterfresh "joint" plaintiff was supposedly rolling.

Defendant Santana admits that observing the plaintiff from the same vantage point as his co-defendants, he did not see what was in plaintiff's hands — he did not see the joint his co-defendants were telling him they saw. [Exhibit 5, pp. 38-40]. Defendant Santana's observation concerning possible criminal activity, including possession of marijuana, consist only of his observation that James "was doing something with himself. I couldn't see what he was doing." [Exhibit 5, p. 40]. The indisputable fact is that Officer Santana believed his own eyes and his eyes told him Mr. Gomez was not possessing marijuana but was doing "something ... I couldn't see."

As per defendants' citation above (Exhibit A, p. 148), defendant Estwick states:

> We believed that on that corner is a drug prone location, and usually it is more marijuana than crack on that corner. We probably believe that

> he could have been selling marijuana or have something to do with marijuana possession.

Defendant Estwick statement indicates that it is statistic and not gestures that informed his understanding as to marijuana possession. The statement indicates Estwick "probably" believed James "could have been" *selling* marijuana because statistically speaking more marijuana is sold on the corner than crack cocaine.

Defendant Estwick's stated basis for stopping the plaintiff was that James "had a lot of money in his hand, I had seen aluminum tin in his hand" and "he's on the corner where a lot of drug arrests was made by people from my precinct and myself included." [Exhibit 3, p. 151]. In other words, no specific actions or gestures suggesting marijuana possession.

Defendants' Statement ¶20

20. Because of plaintiff's actions, Officer Estwick decided that the officers should approach and question plaintiff to see if he was engaged in narcotics related activity. (See Exhibit A, pp. 49, 128-129; Exhibit B, p. 163).

Plaintiff's Response to Defendants' Statement ¶20

There was no indication of "narcotics related activity," [See Plaintiff's Response to Defendants Statements ¶16,18,19]. Defendant Estwick told the CCRB that he advised defendants Munge and Santana to "ask Mr. Gomez about the money under the 'common law right of inquiry'." [Exhibit 10, p. 1, Estwick Interview Details].

Defendants' Statement ¶21

21. The officers reasonably believed that they had reasonable suspicion to approach and question plaintiff because of plaintiff's specific action in the known drug-prone location. (See Exhibit A, pp. 108, 148, 151).

Plaintiff's Response to Defendants' Statement ¶21

Statement 21 is nothing more than a legal conclusion, which, incidently, plaintiff disputes.

Defendants' Statement ¶22

22. The officers did not intend to arrest plaintiff at that point. (See Exhibit A, p. 149).

Plaintiff's Response to Defendants' Statement ¶22

Notwithstanding allegations regarding their intent, defendants *acted* to immediately arrest plaintiff. Defendants intent was clear: "[w]e told him not to – you know, to stop, don't move, we're police, don't move." [Exhibit 4, p. 172].

Defendant Estwick moved the undercover van from where it was parked near to the northwest corner of the intersection [See Exhibit 16, Photograph 7-10] forward and to the right to a point abutting the curb directly adjacent to the southwest corner of Clinton and Stanton to "where Mr. Gomez was standing." [Exhibit 3, p. 133]. The van was close enough to the sidewalk, that when the officers exited the van they stepped out right onto the sidewalk. [Exhibit 5, p. 109]. Thusly, the door that Munge and Santana used to exit the van was now "probably three or four feet" from Mr. Gomez. [Exhibit 3, pp. 132-134]. Defendant Munge admits the distance from where the officers exited the van to the place plaintiff was standing was approximately two feet, [Exhibit 4, pp. 58-59], while defendant Santana estimated the distance at "not even five feet." [Exhibit 5, pp. 106-107].

Thus, defendants all agree it took only seconds for Munge and Santana to cover the distance from the van to Mr. Gomez. [Exhibit 5, p. 110; Exhibit 4, pp. 58-59; Exhibit 3, pp. 133-134].

Defendant Munge admits that plaintiff was ordered "to stop, don't move, we're police, don't move." [Exhibit 4, p. 172].

Defendants' Statement ¶23

23. As Officer Munge and Officer Santana exited the police vehicle to approach plaintiff, they identified themselves to plaintiff by displaying their police shields visibly for plaintiff to see and by yelling "police, police." (See Exhibit A, p. 130; Exhibit B, pp. 167, 169; Exhibit C, pp. 50-51, 62).

Plaintiff's Response to Defendants' Statement ¶23

Defendants Santana and Munge were in the plaintiff's face in a couple of seconds, [Exhibit 3, p. 133-134], by running at the plaintiff yelling, therefore, defendants failed to

identifying themselves to plaintiff in a manner requisite for any human being to register such information:

Q: They were in his face in one second?

Ms. Frommer: Objection

A: Couple seconds, I don't know.

[Exhibit 3, pp. 133-134].

<u>Defendants' Statement ¶24</u>

24. Plaintiff admits that he saw two men approaching him on Clinton Street. (See Exhibit D, p. 45).

<u>Plaintiff's Response to Defendants' Statement ¶24</u>

Plaintiff first noticed defendants Santana and Munge when he saw them approaching him "very rapidly" from no more than five feet away. [Exhibit 1, pp. 45-46]. The officers were yelling and the first thing plaintiff heard was "get him," [Exhibit 1, p. 48; Exhibit 2, p. 10], and then defendant Santana grabbed his arm. [Exhibit 2, p. 10].

<u>Defendants' Statement ¶25</u>

25. Plaintiff admits that he heard one of the men who approached him on the street say "police, police." (See Exhibit D, p. 67).

<u>Plaintiff's Response to Defendants' Statement ¶25</u>

In his statement to Police Department Internal Affairs investigators, Mr. Gomez explained that during the incident the police officers told him that they said 'police, police.' In other words, after they jumped him and he ended up face-first in a dirty puddle of water, the officers began to offer him justifications for what they had done, insisting, "we said 'police, police'" In the IAB interview, plaintiff told investigators that he heard "police" in the "*flash*" between seeing the men coming at him and being grabbed by defendants.

Defendants' Statement ¶26

26. Plaintiff admits that he saw that one of the men who approached him was wearing a shield around his neck. (See Exhibit D, p. 67).

Plaintiff's Response to Defendants' Statement ¶26

The citation above does not indicate any admission about plaintiff seeing a shield around the neck of any of the defendants *as they approached him.* Plaintiff told IAB investigators that *after he was arrested* he noticed a shield around one of the men. [Exhibit 10, p. 4, Gomez IAB Interview Details – "After he was handcuffed, Mr. Gomez noticed that the PO1 was wearing a shield around his neck."].

Defendants' Statement ¶27

27. Making eye contact with plaintiff, Officer Santana also ordered plaintiff to show his hands. (See Exhibit B, pp. 114, 201).

Plaintiff's Response to Defendants' Statement ¶27

Defendant Munge has no recollection of Santana saying this:

Q: Was Officer Santana saying anything when he exited the vehicle?

A: I don't recall.

[Exhibit 4, pp. 62-63]

But then later on in his deposition defendant Munge gave the following testimony:

Q: In your presence did you hear Officer Santana give him any orders?

A: Take your hands out of your pocket.

Q: Did he comply with that order?

A: He did.

Q: So that isn't one of the things that he disobeyed, right?

A: That's correct.

[Exhibit 4, pp. 160].

The plaintiff heard "get him." [Exhibit 1, p. 48; Exhibit 2, p. 10]. Defendant Munge admits that plaintiff was ordered not to move — "[w]e told him not to – you know, to stop, don't move, we're police, don't move. He, you know, continued to move back." [Exhibit 4, p. 172].

Defendants' Statement ¶28

28. Plaintiff did not comply with Officer Santana's orders but rather, backed away from the officers. (See Exhibit B, p. 201; Exhibit C, pp. 63, 159).

Plaintiff's Response to Defendants' Statement ¶28

Defendants admit that it took Santana and Munge as little as two seconds to cover the distance from the van to the plaintiff. [Exhibit 5, p. 110; Exhibit 4, pp. 58-59; Exhibit 3, pp. 133-134]. The defendants were running at James, and immediately grabbed him when they reached where he was standing. [Exhibit 2, p.10].

Q; They were in his face in one second?

Ms. Frommer: Objection

A: Couple seconds, I don't know.

[Exhibit 3, pp. 133-134].

Defendants, to the extent they actually issued any lawful verbal orders, did not wait for compliance or non-compliance; they grabbed the plaintiff.

Defendants' Statement ¶29

29. Officer Munge believed that plaintiff was trying to run away from him and Officer Santana. (See Exhibit C, pp. 63, 159).

Plaintiff's Response to Defendants' Statement ¶29

Plaintiff was standing still when grabbed by defendants Santana and Munge; plaintiff had not had the chance to react, much less to run away. [Exhibit 1, p. 49].

Defendants' Statement ¶30

30. Almost immediately, plaintiff then swung a closed fist at Officer Munge and Officer Santana. (See Exhibit B, p. 114-115; Exhibit C, p. 63).

Plaintiff's Response to Defendants' Statement ¶30

_______Plaintiff did not swing at defendants.

Defendants citation above is to Munge's testimony: "Mr. Gomez started to walk backwards, almost a fleeing motion, still facing us. At that point we tried to apprehend

him, that's when he got violent and gave a closed fist swing to me and my partner Officer Santana ..." [Exhibit 4, p. 63].

Defendant Munge admits that efforts to apprehend plaintiff *preceded* any supposed or alleged violent reaction by plaintiff. Thus, defendant Munge admits plaintiff was arrested *before* any alleged criminal activity took place. [Exhibit 4, p. 63].

Defendants' Statement ¶31

31. At that point, the officers saw that plaintiff engaged in criminal activity. (See Exhibit A, pp. 113, 150).

Plaintiff's Response to Defendants' Statement ¶31

_______As plaintiff did not swing a closed fist at any of the defendants, and was never engaged in any criminal activity.

Defendants' Statement ¶32

32. Officers Munge and Santana then took hold of plaintiff by his arms and tried to handcuff plaintiff behind his back. (See Exhibit B, pp. 121-122; Exhibit C, p. 72; Exhibit D, pp. 49-50).

Plaintiff's Response to Defendants' Statement ¶32

It took two to three seconds for plaintiff to be handcuffed once he hit the ground. [Exhibit 5, p. 138].

Defendants' Statement ¶33

33. Officer Estwick exited the van at that point to assist Officers Santana and Munge who were trying to place plaintiff in handcuffs. (See Exhibit A, pp. 77-79).

Plaintiff's Response to Defendants' Statement ¶33

Estwick exited the van once he had parked it, just seconds after defendants Munge and Santana. [Exhibit 5, p. 109-110] It took two to three seconds for plaintiff to be handcuffed once he hit the ground. [Exhibit 5, p. 138].

Defendants' Statement ¶34

34. Plaintiff admits that he flailed his arms and tried to pull away from the officers. (See Exhibit C, p. 72; Exhibit D, p. 50).

Plaintiff's Response to Defendants' Statement ¶34

Plaintiff does not admit that he flailed his arms and the citations do not support such a claim.

The word "flail" or any form of that word ("flailed," "flailing") does not appear at all in the entire 155 pages of the plaintiff's deposition testimony. See Exhibit 1, Sheet 4 of Gomez Deposition Index.. Nor does the word flail appear in any form in Mr. Gomez 50-h hearing transcript. [See Exhibit 2, Index under "F"].

The citation by defendants indicates that plaintiff was grabbed by both arms and tried to pull free. Plaintiff did not flail his arms, much less flail his arms in a way that would indicate an intent to annoy or alarm the public's repose.

Defendants' Statement ¶35

35. Plaintiff struggled with the officers before the police were able to handcuff plaintiff. (See Exhibit B, pp. 137-138; Exhibit D, pp. 52-53).

Plaintiff's Response to Defendants' Statement ¶35

Given one to two seconds to respond to what Santana and Munge were yelling, and the fact that their plainclothes approach occurred when he had taken money out of his pocket, plaintiff thought he was being robbed and attempted to pull his arms free: "I thought they were going to rob me." [Exhibit 2, p. 30]

The two men easily overpowered the teenager, slamming him to the ground and handcuffing him within a few seconds. Defendant Santana admits it took two to three seconds for plaintiff to be handcuffed once he hit the ground. [Exhibit 5, p. 138].

Defendants' Statement ¶36

36. Officer Estwick did not physically interact with plaintiff nor did he place the handcuffs on plaintiff. (See Exhibit A, pp. 80-81).

Plaintiff's Response to Defendants' Statement ¶36

Defendants' citation above indicates Estwick does not remember if he put the "last cuff" on Mr. Gomez; and contains his admission that he may well have done so.

The CCRB report states "PO Estwick got out of the car and helped handcuff Mr. Gomez." [Exhibit 10, p. 1, Estwick Interview Details]. Defendant Munge informed the CCRB that Officer Estwick handcuffed Mr. Gomez. [See Exhibit 10, p. 2, Munge Interview Details – "PO Estwick exited the car and handcuffed Mr. Gomez."].

Defendants' Statement ¶37

37. No police officer punched or kicked plaintiff at any time. (See Exhibit A, p. 150; Deposition transcript of Rafael Balbi dated January 3, 2007, attached as Exhibit "E" to the Frommer Declaration, p. 31)

Plaintiff's Response to Defendants' Statement ¶37

Plaintiff does not claim, and has never claimed, he was punched or kicked during the incident.

Defendants' Statement ¶38

38. After plaintiff was handcuffed, a pat-frisk of plaintiff was conducted for the safety of the officers. (See Exhibit A, p. 95; Exhibit B, pp. 155-156; Exhibit C, pp. 93, 95).

Plaintiff's Response to Defendants' Statement ¶38

Once the slim fifteen year old was handcuffed, there was no reason to pat frisk him. The officers did not believe he had weapons on him, and had not observed any tell-tale signs of weapons possession:

> Q: Can you recall anything about Mr. Gomez in the times that you interacted with him on Stanton and Clinton that gave rise to a suspicion that he had weapons concealed on his person?
>
> MS. FROMMER: Objection.
>
> A. No.
>
> [...]
>
> Q: Did he have a suspicious bulge?
>
> A: Not that I saw, no.

[Exhibit 5, pp. 197-199].

A: At any time did you suspect James Gomez of criminal possession of a weapon?
Q: No, not at all.

[Exhibit 4, p. 142].

The officers searched and emptied plaintiff's pants pockets — finding his house keys and a contact lens case. [Exhibit 1, p. 58; Exhibit 2, pp. 13-14].

Defendants' Statement ¶39

39. The pat-frisk consisted of checking plaintiff's outer pockets to make sure that plaintiff did not possess any kind of weapon. (See Exhibit A, p. 95; Exhibit C, pp. 93-94; Exhibit D, p. 53).

Plaintiff's Response to Defendants' Statement ¶39

The "pat frisk" consistent of reaching into all of the plaintiff's pockets and digging out their contents — plaintiff's keys and his contact lens holder. [Exhibit 1, p. 58; Exhibit 2, pp. 13-14].

Defendants' Statement ¶40

40. Plaintiff was then transported to the PSA 4 Precinct. (See Exhibit C, p. 120; Exhibit D, p. 59).

Plaintiff's Response to Defendants' Statement ¶40

Admitted. The ride in the unmarked van took "a little over five minutes." [Exhibit 1, p. 75].

Defendants' Statement ¶41

41. During the ride to the precinct, plaintiff never asked for medical attention of any kind. (See Exhibit C, p. 180; Exhibit D, p. 75).

Plaintiff's Response to Defendants' Statement ¶41

The trip to PSA 4 took a few minutes. [Exhibit 4, p. 120; Exhibit 1, p. 75]. During the ride the plaintiff was being asked where the drugs were and being told to tell the truth about his age and where the drugs were or "if I didn't, I would get into trouble." [See

Exhibit 2, p. 18]. Despite the defendants' apparent incredulity, Mr. Gomez had in fact told them the truth: he was in fact fifteen years of age and did in fact have nothing on him. [Exhibit 2, p. 18].

Munge's testimony is to the effect that during the few minutes of the drive to the precinct, none of the officers asked plaintiff any questions, and plaintiff was entirely silent. [Exhibit 4, pp. 120-121].

Defendants' Statement ¶42

42. Plaintiff did not make any complaints to the officers at all while being transported to the precinct. (See Exhibit C, p. 121; Exhibit D, p. 75).

Plaintiff's Response to Defendants' Statement ¶42

James Gomez sat in the van handcuffed behind his back being harshly interrogated about drugs he did not possess. Plaintiff asked what was happening, where he was being taken, and why he had been arrested. [Exhibit 2, p. 18].

Defendants' Statement ¶43

43. Upon arriving at the precinct, plaintiff was immediately brought before the precinct desk. (See Exhibit A, p. 55).

Plaintiff's Response to Defendants' Statement ¶43

When the unmarked van arrived at the PSA 4 indoor garage, defendant Estwick opened the zipper of James' trousers and looked inside his pants for drugs. Defendant Santana swiped his hand on the outside of plaintiff's pants along the crease in the plaintiff's buttocks, feeling for concealed drugs. [Exhibit 1, pp. 85-86].

Mr. Gomez was so obviously physically and emotionally injured, that a non-defendant desk officer at the police station asked him if the arresting officers had "treated him right." [See Exhibit 10, p. 5, Gomez Interview Details].

Defendants' Statement ¶44

44. Officer Estwick informed the desk sergeant that plaintiff was a juvenile and brought plaintiff to the precinct juvenile room. (See Exhibit A, p. 56, 58; Exhibit B, p. 218).

Plaintiff's Response to Defendants' Statement ¶44

Defendant Estwick did not know plaintiff was a juvenile and did not believe plaintiff was telling the truth about his age. [Exhibit 2, p. 18].

"[A]nd I remember he didn't look, appear to be a juvenile to me ... I had no idea the guy was 15 or 14, whatever he was" [Exhibit 3, p.86]. Estwick thought James was 19 years old. [Id].

Defendants' Statement ¶45

45. Plaintiff did not appear to have any physical injuries of any kind while he was in the precinct. (See Exhibit A, pp. 65, 69).

Plaintiff's Response to Defendants' Statement ¶45

Plaintiff was obviously physically injured.

His mother noted a large red bruise on plaintiff face as well as numerous scrapes on his arms and hands. [See, e.g., Exhibit 14].

Plaintiff had sustained numerous physical injuries including abrasions/bruising/swelling to the right side of his face as result of being forced face-first into the pavement of Clinton Street. [Exhibit 6, pp. 2-5, 6 – including a pictorial chart noting a nine by three and one half centimeter (9 x 3.5 cm.) abrasion to the left side of his face, a four by one-half centimeter (4 x .5 cm.) bruise to his left shoulder area, as well as a four by five centimeter (4 by 5 cm.) bruise on his left wrist; see also Exhibit 9, IAB photographs showing abrasions, bruising, redness, and swelling to the right side of plaintiff's face].

Defendant Estwick categorically denies that there was any evidence of injury to plaintiff at the time James was held at PSA 4, and denies that plaintiff's mother made any inquiries about James' obvious injuries — "There was no talk about no hurt because there was no evidence of anything of him being hurt." [Exhibit 3, pp. 65-66]. Defendant Munge's testimony to the CCRB, however, acknowledges that James was injured during the incident; "PO Munge stated that he observed a scrape on Mr. Gomez's face that may have been sustained when he and the officers fell to the ground. He speculated that since Mr.

Gomez fell in a puddle of water and PO Santana landed on top of him, it was possible that those factors resulted in the facial *injuries* depicted in the photos shown by the investigator." [See Exhibit 10, p. 2, Munge Interview Details; Exhibit 9]. Similarly, "PO Santana was shown photos of the injuries sustained by Mr. Gomez. He states that Mr. Gomez's visible injuries were likely caused by the struggle and Mr. Gomez's position of being "front first down on the concrete." [Exhibit 9].

Defendants' Statement ¶46

46. Plaintiff admits that [he] was not visibly bleeding at all while in the presence of the police on July 5, 2004. (See Exhibit D, p. 99, Exhibit E, p. 44).

Plaintiff's Response to Defendants' Statement ¶46

Neither citation above (defendants' Exhibit D, p. 99, Exhibit E, p. 44) has anything to do with the issue of the visibility of bleeding or anything about what happened in the presence of defendant police officers.

Plaintiff's numerous cuts, scrapes, scratches, and bruises documented in the Bellevue Hospital medical records were evidently visible to medical staff at that institution, a little over an hour after plaintiff was released from police custody on the evening of the incident. [Exhibit 6; Exhibit 9].

Defendants' Statement ¶47

47. Plaintiff admits did not sustain any broken bones nor did he require any stitches as a result of his interaction with police. (See Exhibit D, p. 104).

Plaintiff's Response to Defendants' Statement ¶47

Plaintiff has never alleged suffering broken bones, needing stitches, or getting stitches at Bellevue Hospital. [Exhibit 6].

Defendants' Statement ¶48

48. Plaintiff did not sustain any cuts or bruises to his face as a result of his interaction with the police. (See Exhibit D, p. 105).

Plaintiff's Response to Defendants' Statement ¶48

Plaintiff's did sustain abrasions/bruising/swelling to the right side of his face as result of being forced face-first into the pavement of Clinton Street; and the citation referenced above by defendants does not indicate otherwise. See, e..g., Exhibit 6: Bellevue medical records indicating, inter alia, abrasions to the right side of his face measuring according to a pictorial chart nine by three and one half centimeters (9 x 3.5 cm); see also Exhibit 9, Photograph 1 – indicating abrasions, bruising, redness, and swelling to the right side of plaintiff's face].

Defendants' Statement ¶49

49. No strip search of any kind was performed on plaintiff. (See Exhibit A, pp. 105, Exhibit C, pp. 180-181; 110; Exhibit D, pp. 96-97).

Plaintiff's Response to Defendants' Statement ¶49

When the unmarked van arrived at the PSA 4 indoor garage, defendant Estwick opened the zipper of James' trousers and looked inside his pants for drugs. Defendant Santana swiped his hand on the outside of plaintiff's pants along the crease in the plaintiff's buttocks, feeling for concealed drugs. [Exhibit 1, pp. 85-86]. Plaintiff told the CCRB that defendant Estwick opened his zipper and "held the two sides of the zipper open and looked inside through the zipper opening." [Exhibit 10, p. 6, Gomez CCRB Interview Details].

Defendants' Statement ¶50

50. Plaintiff's mother was called and informed that plaintiff was at the precinct. (See Exhibit A, p. 58).

Plaintiff's Response to Defendants' Statement ¶50

Admit.

Defendants' Statement ¶51

51. Plaintiff remained in the juvenile room until his mother arrived at the precinct shortly after she was called. (See Exhibit A, p. 58).

Plaintiff's Response to Defendants' Statement ¶51

James Gomez continued to be kept handcuffed by one arm to a restraining bar in the juvenile room until his mother had finally convinced the defendants that James was in fact fifteen years old. [See Exhibit 11; Exhibit 1, pp. 92-95].

Defendants' Statement ¶52

52. Plaintiff was then released to his mother's custody and he left the precinct. (See Exhibit C, p. 171).

Plaintiff's Response to Defendants' Statement ¶52

Plaintiff's mother provided a passport indicating plaintiff's age, but continued to be challenged and questioned by defendants, who did not believe James was fifteen years old. [Exhibit 14].

Defendants' Statement ¶53

53. Plaintiff was not charged with any crime. (See Exhibit C, p. 171).

Plaintiff's Response to Defendants' Statement ¶53

Defendant Munge completed arrest paperwork including a "Stop, Question and Frisk Report Worksheet" or "UF250" [Exhibit 4, pp. 136-140] and a "Juvenile Report" [Exhibit 4, pp. 168-169]. The Juvenile Report contains a number of fabrications, including that the "AO" (arresting officer) was kicked, [See Exhibit 4, pp.169-170, defendant Munge cannot recall being kicked by plaintiff], and that plainitff "began to swing his arms and kick [arresting officer]" [See Exhibit 11].

Defendants' Statement ¶54

54. Plaintiff departed the following morning on July 6, 2004 for the Dominican Republic. (See Exhibit D, p. 120).

Plaintiff's Response to Defendants' Statement ¶54

Sometime on July 6, 2004 plaintiff and his family departed for the Dominican Republic. [Exhibit 1, 119-120].

Defendants' Statement ¶55

55. Plaintiff did not seek or obtain any medical treatment after he returned from the Dominican Republic. (See Exhibit D, p. 120).

Plaintiff's Response to Defendants' Statement ¶55

Plaintiff's physical injuries healed in about a week to ten days. [See, e.g., Exhibit 1, pp. 119-120]. The plaintiff was unable to sleep for approximately two weeks after the incident. [Exhibit 2, pp. 29-30]. After his return from the Dominican Republic, plaintiff received mental health counseling for the emotional turmoil, pain, and fear resulting from defendants' actions. [See Exhibit 7].

Defendants' Statement ¶56

56. Plaintiff did not miss any work or school as a result of his interaction with the police on July 5, 2004. (See Exhibit D, pp. 125-126).

Plaintiff's Response to Defendants' Statement ¶56

Admit. Plaintiff was on vacation from work and school.

Dated: May 24, 2007
Brooklyn, New York

S/

Ben Currie (NC7957)
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

JAMES GOMEZ, by his mother and natural guardian Gisela De La Cruz,

Plaintiff,

DECLARATION OF BEN CURRIE
05 CV 2147 (GBD)

-against-

THE CITY OF NEW YORK, DENNIS EASTWICK, DENNIS MUNGE, and GEORGE SANTANA, individually and in their official capacity as employees of the New York City Police Department,

Defendants.

-------------------------------------------------------------x

STATE OF NEW YORK )
: SS. :
COUNTY OF KINGS )

BEN CURRIE declares the following under penalty of perjury pursuant to 28 U.S.C. §1746:

1. I am the attorney for plaintiff James Gomez; as such I am familiar with the facts stated below:

2. This declaration is submitted in opposition to Defendants' Motion for Summary Judgment asking for judgment as a matter of law dismissing each of plaintiff's claims for relief.

3. This declaration places before the Court the following exhibits in opposition to defendants' motion.

Exhibit 1: Transcript of James Gomez's April 3, 2006 deposition

Exhibit 2: Transcript of James Gomez's 50-h Hearing testimony taken by the City of New York on December 8, 2004

| | |
|---|---|
| Exhibit 3: | Transcript of the March 29, 2006 deposition of defendant Dennis Estwick (sued herein as "Dennis Eastwick") |
| Exhibit 4: | Transcript of the March 31, 2006 deposition of defendant Dennis Munge |
| Exhibit 5: | Transcript of the March 30, 2006 deposition of defendant George Santana |
| Exhibit 6: | Plaintiff's July 5, 2004 Bellevue Hospital treatment records |
| Exhibit 7: | Counseling records from the University Settlement Society of New York, including Progress Notes made by plaintiff's social worker, Rosa De Lara, LMSW |
| Exhibit 8: | Copy of the Winterfresh gum wrapper used as Plaintiff's Exhibit 11 during pretrial depositions herein along with an exemplar of the Winterfresh gum wrapper recovered from plaintiff at the arrest scene on July 5, 2004 |
| Exhibit 9: | Five color photographs taken by New York City Internal Affairs Bureau (IAB) investigators on the night of July 5-6, 2004 |
| Exhibit 10: | Excerpts from the Civilian Complaint Review Board investigation of this matter, CCRB Case Number 200406638, including Interview Summaries of statements given by defendants Estwick, Munge, and Santana and plaintiff James Gomez |
| Exhibit 11: | "Juvenile Report" dated July 5, 2004 |
| Exhibit 12: | "Stop, Question and Frisk Report Worksheet" prepared by defendant Munge and dated July 5, 2004 |
| Exhibit 13: | April 10, 2002 New York Times article headlined "And to Think That I Ate It on Clinton Street" |
| Exhibit 14: | Affidavit of Gisela de la Cruz, the mother of plaintiff James Gomez, sworn to May 22, 2007 |
| Exhibit 15: | Affidavit of James Gomez sworn to May 23, 2007 |
| Exhibit 16: | Seventeen photographs of the location of the incident taken on or about April 19, 2007 |
| Exhibit 17: | James Gomez's "Civilian Complaint Report" dated July 5, 2004 |

Exhibit 18: "Memobook" entries regarding the incident recorded by defendants Dennis Estwick, Dennis Munge, and George Santana

Exhibit 19: Internal Affairs Bureau Investigating Officer's Report (2 pp.) dated July 6, 2004

4. Plaintiff withdraws with prejudice his second, seventh and eighth claims for relief pursuant to Fed.R.Civ.P. R. 41(a).

Dated: May 24, 2007
Brooklyn, New York

S/______________________________

Ben Currie (**NC7957**)
Attorney for Plaintiff
26 Court Street, Suite 600
Brooklyn, New York 11242
(718) 797-3117

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

JAMES GOMEZ, by his mother and natural guardian Gisela De La Cruz,

Plaintiff,

DECLARATION OF SERVICE
05 CV 2147 (GBD)

-against-

THE CITY OF NEW YORK, DENNIS EASTWICK, DENNIS MUNGE, and GEORGE SANTANA, individually and in their official capacity as employees of the New York City Police Department,

Defendants.

-----------------------------------------------------------x

STATE OF NEW YORK )
: SS.:
COUNTY OF KINGS )

MATTHEW FLAMM, declares the following under penalty of perjury pursuant to 28 U.S.C. §1746:

That on May 25 , 2007, the annexed PLAINTIFF'S STATEMENT PURSUANT TO LOCAL RULE 56.1 IN RESPONSE AND OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION and DECLARATION OF BEN CURRIE were served upon Hillary Frommer, Assistant Corporation Counsel and attorney for defendant City of New York, by personally delivering a copy thereto to the New York City Law Department, 100 Church Street, New York, New York, that being the address within the State designated for that purpose.

S/________________________________
Matthew Flamm

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

JAMES GOMEZ, by his mother and natural guardian Gisela De La Cruz,

Plaintiff,

05 CV 2147 (GBD)

-against-

THE CITY OF NEW YORK, DENNIS EASTWICK, DENNIS MUNGE, and GEORGE SANTANA, individually and in their official capacity as employees of the New York City Police Department,

Defendants.

-------------------------------------------------------------x

# PLAINTIFF'S STATEMENT PURSUANT TO LOCAL RULE 56.1 IN RESPONSE AND OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION and DECLARATION OF BEN CURRIE

---


Ben Currie
Attorney for Plaintiff
26 Court Street, Suite 600
Brooklyn, New York 11242 (718) 797-3117